JEFFREY T. THOMAS, SBN 106409
   jtthomas@gibsondunn.com
BLAINE H. EVANSON, SBN 254338
   bevanson@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive
Irvine, CA  92612-4412
Telephone: 949.451.3800
Facsimile:  949.451.4220

SAMUEL LIVERSIDGE, SBN 180578
   sliversidge@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone: 213.229.7000
Facsimile:  213.229.7520

Attorneys for Defendant
HEWLETT PACKARD ENTERPRISE COMPANY

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| ORACLE AMERICA, INC., a Delaware corporation; ORACLE INTERNATIONAL CORPORATION, a California corporation, <br><br> Plaintiffs, <br><br> v. <br><br> HEWLETT PACKARD ENTERPRISE COMPANY, A DELAWARE CORPORATION; AND DOES 1-50, <br><br> Defendants. | CASE NO. 3:16-cv-01393-JST <br><br> **HEWLETT PACKARD ENTERPRISE COMPANY'S OPPOSITION TO ORACLE'S MOTION FOR PARTIAL SUMMARY JUDGMENT** <br><br> <u>**Hearing**</u>**:** <br> Date:      June 14, 2018 <br> Time:      2:00 p.m. <br> Place:     Courtroom 9, 19th Floor <br> Judge:    Judge Jon S. Tigar |

Gibson, Dunn &
Crutcher LLP

1

**TABLE OF CONTENTS**

2

Page

3    I.    INTRODUCTION ................................................................................................. 1

4    II.    BACKGROUND ................................................................................................. 3

5         A.    HPE's Multivendor Support.......................................................................... 3

6         B.    Terix's Sizable, Independent Sun Support Business.................................... 3

          C.    The Sun / Oracle Relationship ...................................................................... 5

7         D.    Oracle's Dispute with Terix .......................................................................... 6

8    III.    LEGAL STANDARD ......................................................................................... 6

9    IV.    ARGUMENT ...................................................................................................... 7

10        A.    Oracle Is Not Entitled to Judgment on Its Copyright Infringement Claims ................ 7

11             1.    Oracle Has Not Established Ownership of Copyrights Covering Patches
                     at Issue............................................................................................... 7

12             2.    Oracle Cannot Prove Direct Copyright Infringement ....................................... 8

13             3.    Oracle Cannot Prove Indirect Copyright Infringement.................................... 11

14                  a.    Oracle Has Not Identified Instances of Direct Infringement by
                           Terix, or Tied Any Alleged Infringement by Terix to Conduct
15                         by HPE ..................................................................................... 11

16                  b.    Oracle Cannot Establish Indirect Infringement by HPE ..................... 13

17                        1)    Vicarious Infringement ........................................................... 13

                          2)    Contributory Infringement ....................................................... 15

18        B.    Oracle Is Not Entitled to Judgment on HPE's Defenses.............................. 18

19             1.    Express License.................................................................................... 19

20                  a.    The Express License Permits Significant Copying of Oracle's
                           Software ................................................................................... 19

21                  b.    Oracle Is Not Entitled to Summary Judgment on Express
22                         License ..................................................................................... 21

23             2.    Abandonment ....................................................................................... 23

             3.    Implied License and Estoppel ................................................................ 24

24             4.    Fair Use .............................................................................................. 24

25             5.    Section 117 ......................................................................................... 25

26   V.    CONCLUSION ................................................................................................ 25

27

28

1

# TABLE OF AUTHORITIES

2

Page(s)

3

**Cases**

4

*Adickes v. S. H. Kress & Co.*,

5
    398 U.S. 144 (1970) ............................................................................................................6

6

*BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*,
    881 F.3d 293 (4th Cir. 2018) ..................................................................................2, 12, 15, 16

7

*Bourne v. Walt Disney Co.*,

8
    68 F.3d 621 (2d Cir. 1995) ...........................................................................................19, 22

9

*Capitol Records, Inc. v. Naxos of Am., Inc.*,
    372 F.3d 471 (2d Cir. 2004) ............................................................................................23

10

11

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) .........................................................................................................13

12

*Downs v. River City Grp., LLC*,

13
    2015 WL 631294 (D. Nev. Feb. 13, 2015) .........................................................................6

14

*Ellison v. Robertson*,
    357 F.3d 1072 (9th Cir. 2004) ........................................................................................14

15

16

*Fox Broad. Co., Inc. v. Dish Network L.L.C.*,
    747 F.3d 1060 (9th Cir. 2014) ...........................................................................................9

17

*Krause v. Titleserv Inc.*,

18
    402 F.3d 119 (2d Cir. 2005) ............................................................................................25

19

*Luvdarts, LLC v. AT&T Mobility, LLC*,

20
    710 F.3d 1068 (9th Cir. 2013) ...........................................................................2, 15, 16, 18

21

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
    542 F.3d 290 (2d Cir. 2008) ............................................................................................10

22

*Marya v. Warner Chappell/Music, Inc.*,

23
    131 F. Supp. 3d 975 (C.D. Cal. 2015) ..............................................................................23

24

*MDY Indus., LLC v. Blizzard Entm't, Inc.*,
    629 F.3d 928 (9th Cir. 2010) ...........................................................................................22

25

*Med-Sys., Inc. v. Masterson Mktg., Inc.*,

26
    2011 WL 5873399 (S.D. Cal. Nov. 23, 2011) .................................................................16

27

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*,

28
    210 F.3d 1099 (9th Cir. 2000) ...........................................................................................6

1

**TABLE OF AUTHORITIES**
(continued)

2

Page(s)

3

*NXIVM Corp. v. Ross Inst.*,
   364 F.3d 471 (2d Cir. 2004)......................................................................................25

4

5

*Oracle Am., Inc. v. Terix Computer Co., Inc.*,
   2015 WL 2090191 (N.D. Cal. May 5, 2015) ...............................................................7

6

*Oracle Am., Inc. v. Google LLC*,
   886 F.3d 1179 (Fed. Cir. 2018).................................................................................24

7

8

*Pac. Fruit Exp. Co. v. Akron, Canton & Youngstown R. Co.*,
   524 F.2d 1025 (9th Cir. 1975)...................................................................................12

9

10

*Perez v. Alta-Dena Certified Dairy, LLC*,
   647 Fed. App'x 682 (9th Cir. 2016)..........................................................................21

11

*Perfect 10, Inc. v. Amazon.com, Inc.*,
   508 F.3d 1146 (9th Cir. 2007)........................................................................1, 13, 25

12

13

*Perfect 10, Inc. v. Giganews, Inc.*,
   2014 WL 8628031 (C.D. Cal. Nov. 14, 2014)..........................................................16

14

*Perfect 10, Inc. v. Visa, Int'l Serv. Ass'n*,
   494 F.3d 788 (9th Cir. 2007)...............................................................................13, 15

15

16

*Routt v. Amazon.com, Inc.*,
   584 Fed. App'x. 713 (9th Cir. 2014).........................................................................13

17

18

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*,
   756 F.3d 73 (2d Cir. 2014)........................................................................................25

19

*Telemasters, Inc. v. Vintage Club Master Ass'n*,
   371 Fed. App'x 771 (9th Cir. 2010).......................................................................2, 16

20

21

*United States v. Boulware*,
   384 F.3d 794 (9th Cir. 2004).......................................................................................6

22

23

*A.V. ex rel. Vanderhye v. iParadigms, LLC*,
   562 F.3d 630 (4th Cir. 2009).....................................................................................25

24

*Wright v. Warner Books, Inc.*,
   953 F.2d 731 (2d Cir. 1991)......................................................................................24

25

26

**Statutes**

27

17 U.S.C. § 107.................................................................................................................24

28

17 U.S.C. § 117.................................................................................................................25

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES
(continued)

Page(s)

**Other Authorities**

U.S. Copyright Office, *Compendium of U.S. Copyright Office Practices*, 3d ed. (2014) ......................7

U.S. Copyright Office, *Compendium of U.S. Copyright Office Practices*, 2d ed. (1984) ......................7

3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* (3d ed. 2013) ..................................16

**Rules**

Fed. R. Civ. P. 56 ......................................................................................................6, 12, 13, 24

Fed. R. Evid. 401 ..................................................................................................................6

Fed. R. Evid. 403 ..................................................................................................................6

Fed. R. Evid. 602 ..................................................................................................................9

Fed. R. Evid. 802 ..............................................................................................................6, 9

Fed. R. Evid. 901 ..................................................................................................................6

Gibson, Dunn & Crutcher LLP

# I.    INTRODUCTION

Oracle's motion does not in a single instance present evidence establishing the elements required to prove an actual act of copyright infringement.  Nowhere does Oracle identify a particular piece of software installed on an actual server in violation of an identified copyright, or specify by whom, with what knowledge, or when—all essential elements of Oracle's infringement claims.  Oracle instead carefully avoids articulating its theory of infringement, and tries to hold HPE liable as a matter of law based on atmospherics and generalized proof offered at the highest possible level.  That is not sufficient.  Oracle has not even presented a valid framework for evaluating copyright liability, let alone shown a lack of material fact disputes that would warrant summary judgment.

***No Direct Infringement.***  Oracle's motion does not identify a single instance in which (i) a patch with elements protectable by copyright (ii) was installed by HPE, as opposed to someone else, onto a customer's server, and (iii) the server was not entitled to receive that patch on that date.  Oracle's technical expert admitted that Oracle has no evidence that *HPE* actually installed *any* of the patches at issue on *any* direct support customer servers.  This is a complete failure of proof.

***No Indirect Infringement.***  As a threshold matter, Oracle's motion does not even attempt to establish predicate acts of infringement by Terix that could support an indirect infringement claim against HPE.  Oracle claims that Terix's support model involved at times installing patches on servers without the proper entitlements.  But Oracle must do more than generally attack Terix and its executives as bad actors.  Oracle does not identify a single instance in which Terix actually performed an improper installation for an HPE customer.  This failure alone is fatal to Oracle's indirect infringement claims.

Moreover, even if Oracle could establish underlying acts of infringement by Terix, Oracle has not come close to establishing the other elements of vicarious or contributory infringement by HPE.

To establish ***vicarious*** infringement, Oracle must prove that (i) HPE had both a legal right *and* the practical ability to directly put an end to any infringing conduct by Terix, and (ii) Terix's infringing conduct drew customers to HPE and financially benefitted HPE.  *Perfect 10, Inc. v. Amazon.com, Inc*., 508 F.3d 1146, 1173–74 (9th Cir. 2007).  Oracle has failed to establish either element.

Oracle's "control" argument relies almost entirely on HPE's contractual right to terminate its own relationship with Terix, but the Ninth Circuit has squarely held that this is insufficient to establish

1   control.  Moreover, the evidence shows that HPE did not in any sense control Terix.  Terix had over

2   700 customers, only a small fraction of which were HPE customers.  Terix also had its own, direct

3   relationships with customers at issue.  Terix alone—with no involvement from HPE—pitched to

4   customers the business model Oracle claims was infringing.  In fact, Terix excluded HPE from these

5   conversations, refused to share the details of its offering with HPE, and repeatedly assured HPE that it

6   was *not* providing any patches to HPE's customers without proper entitlements.  The enterprise

7   customers who met with Terix were large, sophisticated companies that made their own decisions

8   without any involvement from HPE, about whether they were allowed to obtain patches from Terix.

9       Nor has Oracle established as a matter of law that HPE benefitted financially from Terix

10  providing any patches to customers.  HPE never subcontracted Terix to provide patches to HPE's

11  customers and HPE never received any revenue related to patching.  Oracle claims that without patches

12  customers would not have chosen to use HPE, but customers testified that patches were *not* a "draw"

13  in their decision to enter into a relationship with HPE.

14      To establish ***contributory*** infringement, Oracle must show that HPE (i) had "*actual* knowledge

15  of *specific acts* of [Terix's] infringement," and (ii) "either induced, caused, or materially contributed

16  to" Terix's specific acts of "infringing conduct."  *Luvdarts, LLC v. AT&T Mobility, LLC*, 710 F.3d

17  1068, 1072 (9th Cir. 2013) (emphases added).  Oracle's motion comes nowhere close to meeting this

18  standard, offering only high-level evidence of "generalized knowledge" completely disconnected from

19  any specific acts of actual infringement.  Oracle has not identified the specific acts of infringement by

20  Terix for which it seeks to hold HPE indirectly liable, much less shown that HPE knew of or contributed

21  to those acts.  This is a complete failure of proof.  *Id*; *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns,

22  Inc.*, 881 F.3d 293, 311–12 (4th Cir. 2018).  Nor has Oracle offered any evidence that HPE knew that

23  Terix's processes constituted copyright infringement.  *Telemasters, Inc. v. Vintage Club Master Ass'n*,

24  371 Fed. App'x 771, 775 (9th Cir. 2010).  As noted, Terix excluded HPE from its meetings with

25  customers and actively kept its support and patching policies from HPE, claiming they were

26  proprietary.  Major, sophisticated customers independently concluded that they had a legal right to

27  Oracle patches by virtue of their software licenses.  In light of these facts, it simply is not credible (or

28  legally sufficient) to say that HPE must have known Terix was infringing.

Gibson, Dunn &
Crutcher LLP

Oracle has chosen to present "not a complicated case" (Oracle Mot. at 1), but ignoring the complexities does not relieve Oracle of its burden. Oracle's motion and proposed order seek judgment on "liability," without regard to which copyright registration, plaintiff, customer, server, or installation. There is no possible way Oracle could obtain summary judgment of "liability," and Oracle has not requested summary judgment on a subset of its claims. Oracle's motion should be denied.

## II.   BACKGROUND

### A.   HPE's Multivendor Support

HPE offers multivendor support ("MVS") to customers with datacenters comprised of equipment (such as servers) from multiple manufacturers, including Dell, Fujitsu, IBM, Oracle, and others. HPE regularly subcontracted the delivery of its contracted MVS services to a variety of third-party maintainers, such as ███████████████████████, and (formerly) Terix. *See* Ex. 184 at No. 7.[1] A typical HPE MVS customer has large populations of aging, stable systems, which do not require access to server software patches or updates, but which the customer wants to maintain through the end of the servers' lifecycles. Ex. 123 at 92:14–93:1. The scope of HPE's relationship with each MVS customer is set forth in an individualized Statement of Work ("SOW") between HPE and the customer. Those SOWs required the customer to be ████████████████████████ ███████████████ Ex. 24 at 035. Some SOWs expressly excluded the provision of patches and updates. *E.g.*, Ex. 23 at 011 (██████); Ex. 167 at 986–87 (██████).

### B.   Terix's Sizable, Independent Sun Support Business

Terix was an established third-party maintainer that supported over 770 different companies' Sun environments, including many within the Fortune 500. Ex. 17; Ex. 18 ¶ 47; Ex. 140. During the relevant time period alone, Terix was a subcontractor to at least 35 different MVS resellers (like HPE), and the joint customers here amounted to less than 5% of Terix's Sun support relationships. *Id.* Terix also maintained direct contracts with end-users, including customers at issue here, separate from any HPE involvement. *See, e.g.*, Exs. 54 (██████) & 55 ██████.

Terix developed a legal theory about Solaris license agreements that it called "Clearvision,"

---

[1]   HPE's exhibit numbers continue through Ex. 109 to the Evanson Declaration supporting HPE's motion (Dkt. 469), and begin with Ex. 110 to the Thomas Declaration in support of this opposition.

Gibson, Dunn & Crutcher LLP

and which it shared on occasion with its customers. Terix believed that a Solaris software license included a perpetual right not only to use the Solaris software, but also to receive all future Solaris patches and updates. Some customers agreed with Terix's view (*e.g.*, Ex. 180 at 505 █████████ ████████████████████████████████████████████████████████████████████████████████████████ ██████; Ex. 158). Some even agreed before discussing Clearvision with Terix. *See, e.g.*, Ex. 137 at 40:2–7; Ex. 157.

Terix shared Clearvision with at most three HPE prospective customers, subject to non-disclosure agreements. Ex. 120 at 115:3–4; Ex. 136 at 41:23–42:12. Terix blocked HPE from attending those discussions or knowing what was discussed. *E.g.*, Ex. 164 ███████████████████████ ███████████████); Ex. 124 at 82:24–25, 159:20–21 (████████████████████████████████ ███████████████████████████████); Ex. 123 at 134:9–13, 140:18–24; Ex. 120 at 114:13–17 (Terix would not share what it referred to as its "██████████); Ex. 177 at 701 ██████ ████████████████████████████████████████████████████████████████████████████████████).

Meanwhile, Terix represented to HPE the *opposite* of what it was telling customers in Clearvision. Ex. 124 at 226:2–11 (███████████████████████████████████████████████████████ █████████████████████); Ex. 165 at 589 (Terix telling HPE it ███████████████████████ ██████████████████████████████████████████████████). Terix also intentionally hid its processes from HPE so as not to ████████████████████████████████████████ Ex. 176 at 829–30. Terix also told HPE and customers that it had a separate, but confidential, agreement with Oracle that permitted it to provide certain Oracle patches to its customers. Ex. 130 at 81:9–21; Ex. 145 at 55:3–22. And Terix contractually agreed, time and again, that it would not install Solaris patches on HPE's customers' servers. *See, e.g.*, Ex. 168 at 944 ███████████████████████████████████████ ████████████████████████).[2]

Finally, in November 2012, Terix relented and agreed to read to HPE, over the phone, portions of Clearvision. Ex. 120 at 121:5–13. Terix's Clearvision presentation *did not* state that Terix would

---

[2] There are countless other examples of Terix intentionally violating provisions of its contracts with HPE, or otherwise deceiving HPE. *See, e.g.*, Ex. 175 at 936 (Terix discussing ████████████ its conduct from HPE); Ex. 179 (Terix subcontracting work on ████████ account to another subcontractor, Maintech, in violation of the MCSA); Ex. 178 (same for ███████████████████████████); Ex. 177 at 695 ████████████████████████).

4

Gibson, Dunn &
Crutcher LLP

provide or install any Solaris patches or updates to its customers (let alone how it would do so). The presentation did not mention any of the alleged deception recited in Oracle's motion. Instead, it explained Terix's view of customers' legal rights to Solaris patches under the customers' software licenses. *See, e.g.*, Ex. 174. While HPE was unsure as to whether Terix's position was correct, HPE continued to limit its MVS contracts to hardware-only support. Ex. 120 at 53:11–17; Ex. 121 at 569:20–570:11; Ex. 123.5 at 166:2–17; Ex. 125 at 107:19–108:5.

## C.     The Sun / Oracle Relationship

On January 27, 2010, Oracle acquired Sun Microsystems, Inc., a manufacturer of network infrastructure and software, including Sun's SPARC brand of servers, which predominantly run Sun's Solaris Operating System. By acquiring Sun, Oracle became a hardware company overnight.

***Sun's Licensing and Support Policies.***  Sun's policy was to provide a substantial number of Solaris patches ███████████████████████████ them, meaning that ███████████ ████████████████████████████████████████████████████ ████████████████████████████████████████ Ex. 147 at 865. Sun customers that purchased a SPARC server received a "BCL" or "SLA" license for the Solaris operating system, which granted customers the right to "use" the operating system in perpetuity, as well as the right to "any error corrections provided by Sun." *See* Exs. 11–12.

Sun did not require its customers to purchase annual support contracts, and many chose not to. Sun released the vast majority of its patches for free, in at least the following ways:

- ***Security Patches.***  Sun released *every* security-related patch for free and did not require its customers to purchase maintenance contracts to use them. Ex. 153 at 501.

- ***Firmware Updates.***  Sun released *every* firmware update for free and did not require its customers to purchase maintenance contracts to use them. Ex. 110 at 29:24–30:4.

- ***Upgrades.***  Sun released for free iterative Solaris ██████████ which contained all patches released since the prior version. Ex. 146 at 59:14–20, 60:3–62:7.

Customers were entitled to receive these patches by virtue of their Solaris licenses, *without* an ongoing maintenance contract, and customers purchased Sun hardware with that expectation. Ex. 119 at 20:2–21:1 ████████████████████████████████████████████

1     ████████████████.  Customers who nonetheless purchased Sun support did so:  (i) to receive

2 hardware support, which was Sun's focus, and (ii) to have *real-time* access to a subset of (non-security

3 or firmware) patches, rather than having to wait until the next Solaris version to receive the bundle of

4 patches that Sun provided for free.  Ex. 146 at 163:15–164:18.

5     ***Oracle Changes the Policy.***  Upon acquiring Sun, and with no forewarning to customers, Oracle

6 ████████████ all access to patches—even those Sun *already* made publicly available for free—in a

7 reversal of Sun's longstanding policies.  Ex. 152 at 157; *infra* pp. 23–24.

8 **D.**     **Oracle's Dispute with Terix**

9     On July 19, 2013, Oracle sued Terix, alleging that Terix impermissibly provided its 770+ Sun

10 customers with Solaris patches they were not entitled to.  *Oracle Am., Inc. v. Terix Computer Co.*, 13-

11 cv-3385 (N.D. Cal.) ("*Terix*"); Ex. 140.  Terix and Oracle ultimately settled and stipulated to a

12 judgment without a final disposition on the merits.  Ex. 16.  While HPE does not defend Terix's alleged

13 conduct, Terix was never found liable for Oracle's claims.[3]

14                                          **III.**     **LEGAL STANDARD**

15     Summary judgment is appropriate only upon a "show[ing] that there is no genuine dispute as

16 to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

17 "[T]he moving party must either produce evidence negating an essential element of the nonmoving

18 party's claim … or show that the nonmoving party does not have enough evidence of an essential

19 element to carry its ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz*

20 *Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  If it fails to satisfy this burden, "the nonmoving party

21 has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of

22 persuasion at trial."  *Id.* at 1102–03.  If the moving party meets the burden, the nonmovant must

23 "produce enough evidence to create a genuine issue of material fact."  *Id.* at 1103.  Even where basic

24 facts are undisputed, if reasonable minds could differ as to the inferences to be drawn from those facts,

25 summary judgment should be denied.  *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970).

---

26

27 [3]  Pursuant to Federal Rules of Evidence 401, 403, 802, and 901, HPE objects to use of the stipulated judgment with Terix, which does not include any admission to infringement, let alone an admissible one.  *See, e.g.*, *United States v. Boulware*, 384 F.3d 794, 806 (9th Cir. 2004) ("prior judgment is …

28 [inadmissible] hearsay to the extent that it is offered to prove the truth of the matters asserted in the judgment"); *Downs v. River City Grp., LLC*, 2015 WL 631294, at *2–3 (D. Nev. Feb. 13, 2015).

Gibson, Dunn &
Crutcher LLP

## IV.   ARGUMENT

### A.   Oracle Is Not Entitled to Judgment on Its Copyright Infringement Claims

Oracle fails to identify any instances of infringement.  And even if Oracle's patchwork theory were accepted, numerous material factual disputes preclude summary judgment.

#### 1.   Oracle Has Not Established Ownership of Copyrights Covering Patches at Issue

Oracle does not identify any copyright registrations for the patches or updates at issue.  Instead, Oracle offers certificates of registration for Solaris operating *system and firmware* versions, and contends that those registrations are "prima facie evidence of the validity" of copyrights in *previously released patches and updates*.  Oracle Mot. at 10; Dkt. 462-2–8.  But as the *Terix* court explained, there are "substantial questions about [these] copyright registrations, and in particular, whether [the] portions" of the code in the patches and updates are protectable.  *Oracle Am., Inc. v. Terix Computer Co., Inc.*, 2015 WL 2090191, at *4 & n.35 (N.D. Cal. May 5, 2015) (citing, *inter alia*, U.S. Copyright Office, *Compendium of U.S. Copyright Office Practices*, 3d ed. § 721.8 (2014) (copyright registration for a "version of a computer program does not cover any unclaimable material that may appear in that version," e.g., "[p]reviously published material") and U.S. Copyright Office, *Compendium of U.S. Copyright Office Practices*, 2d ed. § 323.01 (1984) ("Registration for a derivative computer program covers only the additions, changes, or other new material appearing in the program for the first time.")).

In addition, Oracle does not (and cannot) dispute that the registrations can extend only to patches with sufficient source code from registered software constituting protectable creative expression.  On this point, Oracle points only to the opinion of its expert, Benjamin Goldberg.  Oracle Mot. at 10.  But there are gaping holes in Dr. Goldberg's analysis that create material fact disputes.

*First*, ███████████████████████████████████████████.  Ex. 141 n.76.  He thus admitted that he could not conclude that ████████████████████████ ████████████████████████ *See* Ex. 142 at 81:6–15 ████████████████



*Second*, Dr. Goldberg did not even conclude that █████████████████ contained "copyrighted, registered Oracle Source code that is protectable expression."  Oracle Mot. at 10.  Many

Gibson, Dunn &
Crutcher LLP

1  patches that Oracle contends were improperly copied do not appear on his ███████████

2  ████████████████████████████████████████████████████████████████████

3  ████████████████████████          Goldberg Decl., Dkt. 463 ¶ 18.

4      For example, in support of *direct* infringement, Oracle's technical expert (Christian Hicks)

5  identified ██ unique patches that he claims were improperly copied.  *See* Hicks Decl., Dkt. 464 ¶ 11 &

6  Ex. 6.  ███████████ of those patches were *not* identified as protectable by Dr. Goldberg (Goldberg

7  Ex. 3), and Oracle has presented no other evidence establishing that those██ patches are copyrightable.

8  And on *indirect* infringement, Dr. Goldberg apparently concluded that only ████ out of the ████

9  patches identified by Mr. Hicks contain protectable code.  Goldberg Ex. 3.

10      This failure to demonstrate that all the patches at issue are protectable is fatal to Oracle's motion

11  on infringement.  Having not identified the patches it claims were improperly installed (*infra*, pp. 11–

12  13), Oracle cannot establish that these installations involved patches with protectable elements.  And

13  because Oracle's motion seeks partial summary judgment on "liability," and does not request summary

14  judgment on a subset of its copyright claims, its motion as to infringement must be denied outright.

15      **2.    Oracle Cannot Prove Direct Copyright Infringement**

16      ███████    From 2008–2012, HPE managed a subset of ███████ Sun servers.  ███████

17  kept these servers under parallel support contracts with Oracle.  Ex. 133 at 50:20–51:3.  In early 2013,

18  ███████ separately entered into a relationship with Terix directly on recommendation from another

19  company.  Ex. 133 at 36:6–16, 130:9–131:6.  HPE *never* contracted with Terix on the ████

20  account (Ex. 145 at 38:6–10); rather, ███████ instructed HPE where to obtain ███████████

21  ███████████ Ex. 145 at 59:13–15 (emphasis added).  For patches obtained from Oracle, HPE

22  ███████████████████████████████████████████████████████████████ (*id.* at

23  58:22–59:1); for patches obtained from Terix, HPE relied on ███████ and Terix's representations

24  that the servers had proper entitlements (Ex. 130 at 81:5–24 ███████████████████████

25  ███████████████; Ex. 145 at 55:3–17; Ex. 133 at 134:14–135:4, 143:2–12).  In or around late

26  2014, ███████ decided to end its relationship with HPE because HPE had *not* been patching

27  ███████ servers as requested.  Ex. 133 at 19:21–20:2, 32:16–33:16.

28      Oracle argues that the mere fact that HPE installed some patches obtained from Terix onto

████████ servers necessarily establishes infringement.  But that is not a reasonable inference, let alone the *only* reasonable inference, that can be drawn from the evidence because Oracle provides **no** evidence that HPE installed any patches on servers not entitled to the software.  Indeed, Oracle's expert *admitted* that he cannot ████████████████████████████████████████ Ex. 143 at 200:23–201:3.  And there are a host of complex server-by-server and patch-by-patch questions of fact regarding whether any copying could have constituted infringement.  *Infra* pp. 19–22; *supra* pp. 7–8.[4] Indeed, not one of the patches that Oracle contends HPE and/or Terix delivered to ████████ was deemed protectable by Oracle's copyright expert.  *Compare* Hicks Ex. 9 at 19, *with* Goldberg Ex. 3.

Although ████████ gradually moved some servers off Oracle support and onto Terix support, many ████████ servers were, for the entire time at issue, *simultaneously* under Oracle and Terix support contracts and were therefore entitled to patches.  *See* Ex. 130 at 68:24–69:13, 221:5–14 ████████ ████████████████████████████████████████████████████████ ████████████████ ); Ex. 133 at 50:20–51:3 ████████████████████ ████████████████████████████████████████████████████ ); Ex. 145 at 59:21–25. And Terix was obtaining patches *from Oracle* pursuant to ████████ support contracts with Oracle or some other arrangement between Terix and Oracle.  *See* Ex. 133 at 48:25–49:8, 52:5–13.  All of these patch installations would have been licensed.  *See infra* pp. 19–22.

Moreover, some ████████ servers ran Solaris versions 6 and 7 during the relevant time period (Ex. 133 at 29:15–21), and ████████ testified that Terix provided patches for these "older" versions, but *not* for versions 9 and 10.  *Id.* at 40:9–24, 50:15–17.  Any patch HPE installed on a server running Solaris 6 or 7—regardless of whether it came from Terix—could not support an infringement claim because the Solaris 6 and 7 copyright registrations are not alleged in the complaint.  *See* SAC ¶ 64.

**Direct Support.**  Oracle cites no evidence establishing that *HPE* (as opposed to the customers or Oracle) installed any patches on any servers for the direct support customers, or even supported the

---

[4]  At best, the testimony Oracle cites (Oracle Mot. at 11:5-8) demonstrates that some HPE employees were uncomfortable relying on Terix.  That does not establish infringement.  In any event, the testimony constitutes inadmissible hearsay lacking foundation, as is Oracle's reliance on Terix's interrogatory responses.  Fed. R. Evid. 602, 802.  Oracle's reliance on HPE's response to Interrogatory No. 2 is also misplaced because it merely states that ████████████████████████ Dkt. 462-46.  The installation of patches, alone, does not establish infringement.  *See infra* pp. 11–13, 19–22.

9

Gibson, Dunn & Crutcher LLP

servers in any way.  *See Fox Broad. Co., Inc. v. Dish Network L.L.C.*, 747 F.3d 1060, 1067 (9th Cir. 2014) ("Infringement of the reproduction right requires 'copying *by* the defendant,'" not by a third party).  Oracle cites only its expert's *assumption* that HPE installed these patches ███████████ ██████████████████████████████████████  Ex. 143 at 78:8–18.  But an "expert's opinions that are without factual basis and are based on speculation or conjecture are … inappropriate material for consideration on a motion for summary judgment."  *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008).  In addition, the basis for Mr. Hicks's conclusion that ███████ ████████████████████████████████████████████████████████████████ (Hicks Decl. ¶ 11), but that conclusion is wrong, or at least disputed for several reasons.

     *First*, the ████████████ field ██████████████████ only one of which is installation of a patch.  Ex. 162 at 309; Ex. 122 at 84:23–94:15.  Mr. Hicks admitted that at times the ██████████ ████████████████████████ other than installation of a patch.  Ex. 143 at 120:8–123:18 (emphasis added).  For example, Oracle contends that the spreadsheet shows a patch improperly installed on █████████████ but Oracle did not even *release* that patch until ████████████  *Id.*

     *Second*, even if the field reflected *some* patch installation, that would not necessarily mean a *Solaris* patch; the field also reflects installation of *application* patches, which are not at issue in this case.  Ex. 122 at 91:15–92:24 ██████████████████████████████████████).

     *Third*, even if the field did reflect the installation of a Solaris patch, there is no way of telling *who* installed it.  The spreadsheet includes servers that are not supported by HPE at all (Ex. 122 at 129:17–130:5), or are generally supported by HPE but patched by others (*id.* at 130:6–22).  Sometimes *customers* installed their own patches (*id.* at 131:1–24 ██████████████████████████ ████████); other times *Oracle* assisted with patch installation (Ex. 88 ███████████████ ████████████████████████); and other times *third parties* installed the patches (Ex. 122 at 133:1–11).  The fact that a patch is recorded in the Excel spreadsheet does *not* mean that HPE installed that patch, *or even supported that server*, since many customers ask HPE to track, manage, or monitor their datacenters without any software support at all.  *See* Ex. 122 at 129:17–133:11 ███████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

1    ███████████████████████████████████████; *see also id.* at 130:12–13.

2    **3.  Oracle Cannot Prove Indirect Copyright Infringement**

3          Oracle has not presented evidence of a single predicate instance of direct infringement by Terix,

4    nor has it established the remaining elements necessary to prove contributory or vicarious infringement

5    by HPE.  At the very least, there are several factual disputes on these claims.

6          **a.  Oracle Has Not Identified Instances of Direct Infringement by Terix, or
             Tied Any Alleged Infringement by Terix to Any Conduct by HPE**

7

8          Oracle's evidence of direct infringement is comprised of deposition testimony generally

9    describing Terix's allegedly "Unlawful Solaris Support Model."  Oracle Mot. at 5–6.  Oracle's motion

10   recites statements Terix personnel allegedly made to customers, describes a "playbook" Terix allegedly

11   used to "avoid[] detection by Oracle," and points out that Terix settled the case Oracle brought against

12   it.  *Id.*  But none of this establishes even *a **single act of infringement*** by Terix, let alone specific to the

13   few customers here at issue among the 770 for which Terix provided support for Sun servers.

14         Oracle does not establish a single instance in which Terix obtained a patch that contained

15   protectable elements and then installed that patch on a relevant customer's unentitled server.  Indeed,

16   in discovery, Oracle did not even seek evidence of patch installation from the customers who possessed

17   these servers, notwithstanding that Oracle subpoenaed many of those customers for *other* evidence (*See*

18   Dkt. 471 ("HPE Mot.") at 10; Exs. 47–49 & 5 at No. 25), *and* has ██████████████████████

19   ████████████████ (Ex. 111 at 140:25–141:6, 142:22–143:24; Ex. 151 at 10).

20         Oracle's technical expert attached to his report lists of patches that he claims Terix

21   "downloaded" and "delivered" to customers.  The "downloads" in the list are not tied to any specific

22   customers or any specific servers, nor are they connected to any of the alleged "deliveries."  And Oracle

23   has no evidence—none—that any of those downloaded and/or delivered patches were ever *installed* on

24   a relevant customer's server, let alone on a server not entitled to receive those patches.  Ex. 143 at

25   167:17–168:2.

26         "Download" of a patch simply means that Terix or a customer used valid log-in credentials to

27   access and download a patch, which is entirely permissible under the licenses.  *See infra* pp. 19–22.

28   "Delivery" of a patch simply means that Terix placed a patch on an FTP site for the customer to retrieve;

it does *not* mean that the patch actually was accessed by a customer, let alone installed on a customer's unentitled server.  *See id*.  Thus, Oracle's statement that "customers with unsupported hardware systems are not entitled to download or receive Solaris patches or other support" (Oracle Mot. at 4) is completely wrong.  A customer with both supported and unsupported hardware systems can *download* and *receive* patches; the patches simply cannot then be *installed* onto unsupported hardware systems, only onto supported ones.

Even if the evidence Oracle cites could support a finding of direct copyright infringement by Terix, Oracle has not even attempted to connect *any* specific acts of direct infringement to any conduct by HPE.  It is plainly insufficient for Oracle to establish instances of direct infringement, but to rely on entirely unrelated conduct for the elements of vicarious and contributory infringement.  Indeed, the Fourth Circuit in *BMG* recently reversed a judgment following a jury trial for this very reason—namely, that under the lower court's instructions, the jury impermissibly "could have found" the knowledge prong satisfied based only on evidence "showing that *some number of [defendant's] subscribers* were infringing …, even if [evidence] did not show *which ones* were infringing."  881 F.3d at 311.[5]

At the very least, Oracle's motion must be denied because Oracle requests partial summary judgment on "liability" (Oracle Mot. at i; Proposed Order), but discusses only a small subset of the infringement it accuses.  For example, on contributory infringement, Oracle mentions two customers (▮▮▮▮▮▮▮▮▮▮▮) and then states that "[a]t trial, Oracle will prove that HPE and Terix engaged in similar conduct with many other customers."  Oracle Mot. at 16.  That is not how Rule 56 works.

Oracle argues that "partial summary judgment on liability is wholly appropriate, even if questions about the scope of misconduct and damages are reserved for trial."  *Id*. at 9.  But none of the authorities it cites permits a plaintiff to obtain summary judgment on "liability" by supporting only a subset of its claim.  *E.g., Pac. Fruit Exp. Co. v. Akron, Canton & Youngstown R. Co.*, 524 F.2d 1025, 1026, 1030–31 (9th Cir. 1975) (summary judgment on "liability issue" appropriate where it was

---

[5]  Further factual disputes include:  Of the patches identified by Oracle as "delivered" by Terix, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 141 at 50–51); ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*id*. at 49–50); ▮▮▮▮▮▮ (*id*. at 45). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id*. at 46–49.  All of these factual disputes preclude summary judgment.

"undisputed" that *all ninety* relevant entities liable).  Rule 56 expressly requires identification of the subset of the case for which a moving party seeks judgment:  "A party may move for summary judgment, *identifying each claim or defense—or the part of each claim or defense—*on which summary judgment is sought."  Fed. R. Civ. P. 56(a) (emphasis added); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (moving party bears "initial responsibility of informing the district court of the basis for its motion").  If Oracle wished to seek summary judgment on some portion of its copyright claim, it could have done so.  *See* HPE Mot. at 7–8.  But having sought a sweeping "order finding HPE liable on Oracle's copyright infringement claims" (Oracle Mot. at 17), Oracle must meet the summary judgment standard with respect to its entire infringement cause of action, or its motion must be denied.  Oracle did not meet this burden, and its motion should therefore be denied.

### b.      Oracle Cannot Establish Indirect Infringement by HPE

In addition to its failure to establish predicate acts of direct infringement, Oracle has not established several essential elements of vicarious and contributory infringement.

### 1)      Vicarious Infringement

***No Control.***  Oracle has failed to establish that HPE had "both a legal right to stop or limit the directly infringing conduct, as well as the practical ability to do so."  *Amazon*, 508 F.3d at 1173.  The *only* evidence Oracle cites for HPE's legal right to control Terix is the Master Consolidated Services Agreement ("MCSA") between HPE and Terix (Oracle Mot. at 12), but the mere existence of a contractual relationship that can be terminated does not establish control.  *Perfect 10, Inc. v. Visa, Int'l Serv. Ass'n*, 494 F.3d 788, 803 (9th Cir. 2007); *Amazon*, 508 F.3d at 1173.  Rather, Oracle must show that HPE had the right to "directly put an end to [the infringing] conduct."  *Routt v. Amazon.com, Inc.*, 584 Fed. App'x. 713, 714 (9th Cir. 2014) (summarizing Ninth Circuit law); *see* Dkt. 471 at 13–14.

There is also a wealth of evidence showing that HPE did *not* have the practical ability to control Terix.  As discussed above (pp. 3–6, 8), Terix was a substantial, independent support services company with over 700 customers, only a small fraction of which were also HPE customers.  Terix was in most instances HPE's *competitor*.  Over 35 other companies, besides HPE, also subcontracted support work to Terix.  Terix had independent relationships with customers at issue in this case, and was recommended to these customers by entities other than HPE.  Terix met with the customers separately,

Gibson, Dunn &
Crutcher LLP

and, indeed, took affirmative steps to keep HPE out of those meetings.  Terix refused to share its Clearvision presentation with HPE, and repeatedly told HPE that it would *not* provide any patches to HPE's customers without the proper entitlements in place.  Customers who met with Terix made their own decisions, without any involvement from HPE, about whether they were entitled to obtain patches from Terix.  These customers were large, sophisticated entities, many of whom had contracts with HPE that expressly stated that the customer was responsible for ensuring that the necessary support contracts and entitlements were in place for any required patches or updates.

*No Financial Interest in the Infringing Acts.*  Oracle must prove both: (i) that Terix's infringing conduct *drew* customers to HPE *and* (ii) that HPE financially benefitted from the infringing conduct.  *See Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004).  Oracle proves neither.

*First*, Oracle vaguely argues that "[t]he ability to provide Solaris patches was an important component to HPE's multivendor solution" (Oracle Mot. at 13), but even if true, that is insufficient because "the central question of the 'direct financial benefit' inquiry … is whether the infringing activity constitutes a draw for subscribers, not just an added benefit."  *Ellison*, 357 F.3d at 1079.

Moreover, customers were *not* drawn to HPE for free patches; customers understood that obtaining patches and entitlements was *their* responsibility.  *E.g.*, Ex. 134 at 70:19–22 ███████████ ████████████████████████████████████████████████████████████████████████████████ ████████ ); Ex. 120 at 35:1–13 ██████████████████████████████████████████ █████████████████████████████ ; Ex. 131 at 56:11–23 ██████████████████████████████ ██████████████████████████████ ); Ex. 135 at 67:4–19 ███████████████████████████████ █████████████████████████████████████ ); Ex. 137 at 22:19–24.  And customers testified explicitly that unlawful access to patches was *not* the reason they contracted with HPE.  *E.g.*, Ex. 132 at 52:3–54:18 █████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████  Ex. 131 at 16:17–18:3; Ex. 138 at 84:15–18, 214:3–12.

*Second*, Oracle argues that HPE had "a financial interest in this business relationship" with

Terix (Oracle Mot. at 13), but Oracle must prove that HPE benefited from Terix's infringing *acts*, not just from a general business relationship with Terix. *See Visa*, 494 F.3d at 802 (requiring proof of "a *direct* financial interest *in the infringing activity*") (emphases added).

The two documents Oracle cites for this argument show the opposite of what it contends. The first indicates Terix was providing *hardware* support, not free Solaris patches, to an undisclosed list of ███████████ Dkt. 462-35 ██████████████████████; Ex. 123 at 238:1– 4. The second is a generic congratulatory note among sales representatives about the ████ account and certainly does not connect HPE's sale to any infringing act by Terix. *See* Dkt. 462-59 at 734 (HPE sends similar ████████████ for ████████████). And the SOW for ████ attached to that email expressly limits HPE's responsibilities to hardware break-fix and advisory support, specifying that obtaining ████████████████ if any, would be one of ████████████ Dkt. 462-59.

### 2) Contributory Infringement

*No Knowledge.* Oracle cannot show that HPE had "knowledge" of "*specific instances* of infringement." *BMG*, 881 F.3d at 312.

*First*, the Ninth Circuit in *Luvdarts* made clear that a plaintiff must prove "*actual* knowledge of *specific acts* of infringement." 710 F.3d at 1072 (emphases added); *see also BMG*, 881 F.3d at 312. Oracle purports to quote *Luvdarts* as adopting a "reason to know" standard (Oracle Mot. at 14), but that statement appears nowhere in the Ninth Circuit's opinion. To the contrary, *Luvdarts* held expressly that "generalized knowledge ... of the possibility of infringement" is insufficient. 710 F.3d at 1072; *see also BMG*, 881 F.3d at 310. Oracle is arguing under an incorrect legal standard, and has not even *attempted* to meet the controlling "actual knowledge of specific acts of infringement" standard.

*Second*, Oracle has not established that HPE had even *generalized* knowledge of Terix's conduct. Oracle devotes a significant portion of its motion to its summary of "Terix's Unlawful Solaris Support Model" (Oracle Mot. at 5–6), detailing all of the "techniques" Terix purportedly employed "to conceal Terix's involvement from Sun and later Oracle" (*id.* at 6). But nowhere in its motion does Oracle present evidence demonstrating that *HPE had knowledge of these techniques*.

To the contrary, there is a wealth of evidence showing that HPE did *not* have knowledge of

these "techniques" (*e.g.*, Ex. 143 at 152:9–17), or of Terix's alleged general conduct.  Terix went to great lengths to conceal its process from HPE. *See supra* pp. 3–5.  Thus, even if generalized knowledge were enough (it is not), there are disputed issues of fact that preclude summary judgment.

*Third*, factual disputes abound as to what HPE allegedly knew.  Oracle's own employees offered HPE employees differing interpretations of Oracle's policies *months after* they went into effect. *See, e.g.*, Ex. 163 at 354 ██████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

██████████████████████████████ And even if individual HPE employees had some knowledge relating to Oracle's and Sun's support *policies* (Oracle Mot. at 4–5, 14), that is not knowledge that Terix's conduct exceeded the scope of Oracle's licenses and constituted *copyright infringement*—as is required for contributory infringement.  *See, e.g.*, *Perfect 10, Inc. v. Giganews, Inc.*, 2014 WL 8628031, at *7– 10 (C.D. Cal. Nov. 14, 2014), *aff'd*, 847 F.3d 657 (9th Cir. 2017); *Telemasters*, 371 Fed. App'x at 775; 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 12.04[A][3][a] (3d ed. 2013); *Med- Sys., Inc. v. Masterson Mktg., Inc.*, 2011 WL 5873399, at *6 (S.D. Cal. Nov. 23, 2011).

*Fourth*, even if some employees at HPE had generalized knowledge that Terix was engaging in copyright infringement (which they did not), that would not satisfy Oracle's burden of proving knowledge of any particular *instance* of infringement by Terix. *See, e.g.*, *BMG*, 881 F.3d at 311–12; *Luvdarts*, 710 F.3d at 1072; *supra* pp. 11–13.

**No Contribution.**  Oracle also cannot show that HPE "either induced, caused, or materially contributed to [Terix's] infringing conduct." *Luvdarts*, 710 F.3d at 1072.

*First*, Oracle focuses on a single *internal* HPE communication from 2011 that it entirely misconstrues.  *See* Oracle Mot. at 14; Dkt. 462-38.  The document identifies ██████████ or ██████ (Ex. 125 at 302:20–22) ████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

██████████████████████████████████████. Dkt. 462-38 at 703–04.

This document does not remotely show that HPE induced, caused, or materially contributed to infringing conduct.  To begin with, Oracle offers no evidence that anyone at HPE ever relayed to a single customer the ██████ set forth in this internal document.  Moreover, as the author of the

document testified, ███████████████████ Ex. 125 at 73:18–25, 240:2–11.  HPE did not

even know what Terix's offering was.  *Id.* at 308:2–5.  The document was simply explaining that one

option that could be presented to customers was that the customer contact Terix to ██████████

████████████████  *Id.* at 307:21–308:5 (emphasis added) ████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████ ; *id.* at 310:12–19.  The document offers zero connection to any infringing conduct.

     *Second*, Oracle does not connect any alleged contribution by HPE to any specific acts of

infringement.  *See supra* pp. 11–13.  Oracle points to anecdotal evidence regarding the ████████

██████████████████████████████████████████, but none of it establishes actual acts

of infringement or HPE's contribution to such infringement:

          ██████:   The vast majority of the documents Oracle cites involve discussions between

██████ and HPE employees *before* these entities signed their contract.  But in the actual SOW

resulting from those negotiations, ██████ and HPE agreed that the ████████████████

██████████████████████████████████ from the agreement,

and that Solaris-related support from HPE would be limited to support of a ████████████████

████ Ex. 167 at 986.  ██████, *not HPE or Terix*, was contractually responsible for obtaining and

performing any and all necessary patching.  *Id.* at 985–86.

     Oracle points out that HPE employees sometimes forwarded Solaris issues to Terix.  But this

was Terix's stated role:  to diagnose potential operating systems problems, and inform ██████ as to

*whether* patches or updates were necessary.  Ex. 170 ("██████████████████████████

█████████████████████████████████████████████████████████

██████████████████████████████████████

     Moreover, to the extent Terix engaged in patching for ██████ Terix made a number of key

misrepresentations to HPE to conceal that conduct.  Terix misrepresented that to the extent any out-of-

scope issues with Oracle servers arose for ██████ (e.g., patches), Terix would ██████ Oracle to

resolve them.  Ex. 169.  Terix also made deliberate efforts to keep HPE in the dark about the specifics

of its one-on-one conversations with ██████  *See, e.g.*, Ex. 177 at 695 ████████████████

Gibson, Dunn &
Crutcher LLP

1    696 ███████████ 697 ████████████████████.

2            ███:  Oracle points to a handful of communications between HPE and ███ involving

3    inquiries about the possibility of Terix providing operating system support, but these documents show

4    only that ████ *asked* HPE ████████████████████████████

5    ████████████████ Ex. 126 at 93:11–14.  They do not demonstrate that Terix ever *provided*

6    patches and updates to ████, let alone that (i) any such provision constituted copyright infringement,

7    or (ii) that HPE "induced, caused, or materially contributed" to that conduct.  *Luvdarts*, 710 F.3d at

8    1072.  Indeed, HPE's account representative for ████ had "████ whether "█████████

9    ████████████████████████ Ex. 126 at 91:17–21.

10           ████████:  For ████, Oracle offers just one sentence of very general deposition

11   testimony concerning tickets that ████ would submit to HPE.  Oracle Mot. at 8.  As ████

12   corporate representative testified and Oracle acknowledges, ████████████████████

13   ████.  *Id.*  HPE handled *only* the hardware support for ████ (*see, e.g.*, Ex. 127 at 60:20–24), and

14   to the extent ████ had any questions about patching, it must have worked with Terix directly, without

15   HPE's involvement (*see, e.g.*, *id.* at 61:4–11).

16           █████████:  Oracle cites a single document where Terix and reseller ████—not

17   HPE—provide a non-answer to ██████ request that Terix commit to provide patches without

18   an Oracle support contract.  *See* Oracle Mot. at 15.  HPE specifically *refused* to contract with ████

19   ████ for patch support.  Ex. 173 at 713.  And it is undisputed that neither HPE nor Terix *ever*

20   delivered a single patch to ████████.  Ex. 136 at 77:3–78:2.

21           The Other 33 HPE/Terix Customers:  Oracle offers *zero* evidence of HPE's contribution toward

22   or knowledge of particular acts of infringement by Terix directed at the other 33 customers.  This alone

23   warrants denial of Oracle's motion on contributory infringement.  *See supra* p. 11–13.

24   **B.    Oracle Is Not Entitled to Judgment on HPE's Defenses**

25           Oracle challenged on the pleadings each of the defenses it now raises at summary judgment,

26   but this Court in each instance rejected Oracle's challenges, relying on the fact-specific nature of these

27   defenses.  *E.g.*, Dkt. 174 at 4–5, 8.  Oracle's summary judgment challenge does not include any

28   undisputed evidence, and largely recycles the same arguments the Court already rejected.  Summary

judgment should be denied for the same reasons the Court denied Oracle's motion to strike.

### 1.    Express License

Oracle's licenses covering Solaris 8, 9, and 10 permit the "use" of Solaris "updates" or "error corrections" that were "provided" by Sun or Oracle. Ex. 11 (Solaris 8, 9); Exs. 12 & 156 (Solaris 10). The terms "error corrections" and "Software updates" in these licenses refer to Solaris patches and updates, as Oracle and its executives have acknowledged. *See* Ex. 181 at 18 ("the BCL and SLA are expressly limited to patches 'provided' by Oracle"); Ex. 112 at 287:9–14 ("error corrections" means "bug fixes"). As a result, the *use* of patches that were *provided* by Sun or Oracle did not constitute infringement. Oracle has not come close to meeting its burden to show that the conduct it accuses fell outside these licenses. *Bourne v. Walt Disney Co.*, 68 F.3d 621, 631 (2d Cir. 1995). Its motion for summary judgment on HPE's express license defense must therefore be denied.

### a.    The Express License Permits Significant Copying of Oracle's Software

As discussed throughout this brief and in HPE's motion, Oracle cannot show that Terix's or HPE's conduct exceeded the scope of the licenses, and summary judgment should be granted to HPE. But there are at the very least triable issues of fact both on which patches Sun or Oracle "provided," and whether a particular patch was "use[d]" in a way contemplated by the licenses, which preclude summary judgment for Oracle.

*"Provided."* As discussed above, patches are "provided" in at least three ways.

*First*, patches that Sun (or Oracle) made publicly available were "provided." Ex. 181 at 6 n.4; Ex. 110 at 117:10–15 ███████████████████████████████████████ ██████████████████████████████████████████████████████████████ Sun released many public patches—at one point, at least ███ of Sun patches were public. Ex. 149 at 566; Ex. 155 at 888. Some of the patches Oracle contends were used in an infringing manner in this case have been identified as public *by Oracle*. *E.g.*, Ex. 141 ¶¶ 83(e). The evidence suggests that additional patches forming the basis of Oracle's claims were also public. *E.g.*, *supra* p. 9.

*Second*, a patch was "provided" to a server that was on active support at the time the patch was released. *See* Oracle Mot. at 4.

*Third*, patches that Oracle releases are "provided" to servers that are under an Oracle support

Gibson, Dunn &
Crutcher LLP

contract at that time, and are licensed for future "use" on those servers, even if not installed (or even downloaded) until *after* its support contract expires. *See* Ex. 45 ███████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ █████████████████████); Ex. 46; Ex. 141 ¶¶ 46–47.

*"Used."*   The licenses authorize the "use" of any "provided" patches, which necessarily includes the ability of a customer *or an agent acting on its behalf* to (i) download, (ii) deliver, and (iii) install patches, which Oracle's executives acknowledge. *E.g.*, HPE Mot. at 9 n.4; Ex. 39; Ex. 110 at 152:7–14 █████████████████████████████████████████████████████████████████████

Oracle's motion and expert report ████████████████████████████████████████████ ████████████████████████████████████████████████████████. *See* Ex. 141 ¶¶ 39–42. Oracle's motion makes no attempt to articulate a theory of infringement, instead simply reciting vague descriptions of Terix's business model. But several "uses" of the software were plainly licensed.

*First*, Terix logged into My Oracle Support ("MOS") pursuant to an active Oracle support contract (the only way to access MOS) and **downloaded** Solaris patches. *See* Oracle Mot. 4, 5. To have an active MOS credential, the downloading entity (Terix or the customer) must have an active support contract. *See* Ex. 114 at 55:21–58:7. Oracle's download data do not state for which server a patch was downloaded, whether that server was under an Oracle support contract, or whether the patch was ever installed (let alone on what server), and Oracle has no information at all for the thousands of patches released prior to 2010. *See* Ex. 139 at 147:19–148:20 (████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ██████████████████████); *see also* Ex. 141 ¶¶ 71–77; Ex. 115 at 81:19–82:21, 85:16–21; Ex. 113 at 41:15–21. As a result, the *downloads* could not possibly constitute infringement.

*Second*, Terix **delivered** those patches, via FTP site, to customers. *See* Oracle Mot. at 17; SAC ¶ 33. Such "[██████████████████████████████████████ and copying a patch onto an FTP is licensed where those accessing the FTP have servers ██████████████ Ex. 139 at 145:15– 146:2. Here, *every customer* to whom Terix is alleged to have delivered patches had a license to receive

1  those patches because they had servers under Oracle support at the time of alleged delivery.  *See* Ex.

2  139 at 150:10–151:13 ███████████████████████████████████████████████████

3  █████████████████████████████████████████████████████████████████████████

4  ████████.  To take just one example, Oracle alleges that patches were improperly delivered to joint

5  HPE/Terix customer ██████ on the following dates: ████████████████████████████

6  █████████████████████████████████ (Exs. 6 & 144); however, Oracle's own

7  ████████████████████████████████████████████████ (Dkt. 329-

8  12)—show that ██████ had servers under an active Oracle support contract on *each and every one* of

9  these dates (Ex. 185).[6]  The same is true for the patches Oracle alleges were improperly delivered to

10  ██████.  *Compare* delivery dates in Exs. 6 & 144, *with* contract status fields in Ex. 186.  Similarly,

11  during the period of alleged infringement, ██████ had servers on Oracle support.  *See* Ex. 137 at

12  16:16–20; Ex. 160.5 at 7577.

13       *Third*, Terix or the customers may have ***installed*** some of the delivered patches onto servers.

14  But as discussed below (p. 22) and explained by HPE's expert (Ex. 139 at 143:24–144:16), whether a

15  particular installation was infringing depends on resolution of several facts—facts for which Oracle

16  has no evidence.  Only if a patch containing protectable expression was installed on a server without

17  the proper entitlements could that act of copying constitute copyright infringement.

18           **b.**    **Oracle Is Not Entitled to Summary Judgment on Express License**

19       In order to obtain summary judgment on HPE's express license defense, Oracle would need to

20  show that it is inapplicable to any aspect of the case.  *See Perez v. Alta-Dena Certified Dairy, LLC*,

21  647 Fed. App'x 682, 685 (9th Cir. 2016) (reversing "complete dismissal" of two claims where only

22  certain "'pieces' of the two causes of action" failed).  Oracle's motion characterizes HPE's defense as

23  simply what Terix argued to Judge Grewal, but that is wrong.[7]  Terix asserted an "all-or-nothing"

---

24  [6]  An active Oracle support contracts exists for a server whe ████████████████████

25  ████████████████████████████████████████████████████████████████████████

26  ██████  *See* Ex. 113 at 75:15–85:24, 103:16–19.

27  [7]  HPE's interrogatory response states that the Oracle license accompanying a server "grant[s] a perpetual license to the accompanying *software*."  Ex. 34, No. 9 (emphasis added).  The response also states that that the licenses grant customers the right to use "Software and Support Materials [i.e., patches] provided at Sun's discretion, *in whatever manner Sun actually supplies them*" or "regardless

28

1   express license defense that it was entitled to all Oracle patches in perpetuity, and Judge Grewal

2   rejected only that defense.  The order makes clear that many acts of copying *are* licensed; but the court

3   had no occasion to address *which* copies were licensed and which were not.  Ex. 15 at 10 ("In fact,

4   Oracle freely provides patches to every customer with a support contract, which is consistent with the

5   licenses' terms."); *id.* at 3 n.13 ("Oracle's copyright claim does not extend to any 'public' Solaris

6   patches Sun provided to Defendant's customers before 2010.").

7        HPE has identified the licenses that cover the conduct that Oracle is accusing in this case (the

8   BCL, the SLA, and the Entitlement).  It is *Oracle's* burden to show that conduct it accuses fell outside

9   those licenses.  *See Bourne*, 68 F.3d at 631 (where "the scope of the license is at issue, the copyright

10  owner bears the burden of proving that the defendant's copying was unauthorized").  As HPE argues

11  in its motion for summary judgment, Oracle cannot do this, and summary judgment should be granted

12  to HPE.  But at the very least there are fact disputes that preclude summary judgment for Oracle.

13       For example, there are triable issues on which patches contained protectable expression (*supra*

14  pp. 7–8) and which of the patches were publicly released (*supra* pp. 5–6, 19–20).  And a further

15  determination that a particular installation was infringing involves a complicated and fact-dependent

16  analysis that Oracle has not even attempted to perform (and for which Oracle has no evidence).  *See*

17  Ex. 141 ¶ 83(f).  Oracle would need to analyze the manner in which Sun or Oracle provided the patch,

18  the date the patch was released, the history of support for the particular server, the identity of the

19  individual performing the installation, the date of the installation, and so forth.

20       Oracle acknowledges none of this in its motion, and certainly does not show that the undisputed

21  facts establish that all of the conduct it accuses exceeded the scope of the license.[8]

22

23  of how Sun *chooses to provide them*."  *Id.*  Customers are entitled to patches *actually* provided—either
    publicly or via a support contract.  HPE incorporates by reference its objections to Interrogatory No. 9

24  (and Interrogatory No. 8, which it, in turn, incorporates).  In any event, Judge Grewal's interlocutory
    order is not binding on HPE or this Court.

25  [8]  The Solaris 11 license is irrelevant because Oracle does not contend, in its interrogatory responses
    (Ex. 183), complaint (Dkt. 305), or expert reports (Ex. 32), that any patches were improperly installed

26  on a server running Solaris 11.  The MSLDA allowed HPE to resell support contracts to customers (Ex.
    166) who could then obtain patches pursuant to those contracts.  *Supra* pp. 19–21.  And Oracle's

27  reference to the "click through license" is a distraction, because it does not modify the BCL or the SLA,
    nor could it since the licenses are integrated agreements.  The "click through license" is at best a

28  covenant, not a license condition, and any alleged breach of it cannot form the basis for a copyright
    infringement claim.  *MDY Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928, 939–42 (9th Cir. 2010).

22

### 2. Abandonment

As the Court explained in denying Oracle's motion to strike, "'what does or does not constitute abandonment appears to be a highly fact-specific inquiry.'"  Dkt. 174 at 5 (quoting *Marya v. Warner Chappell/Music, Inc.*, 131 F. Supp. 3d 975, 992 (C.D. Cal. 2015)); *see also, e.g.*, *Capitol Records, Inc. v. Naxos of Am., Inc.*, 372 F.3d 471, 483 (2d Cir. 2004) ("federal procedural law would normally render the issue of intent to abandon inappropriate for summary judgment").  And the Court held that Oracle's authorities—the same ones it relies upon here—"do not address a situation in which a plaintiff acquired copyright material that had previously been supplied for little or no cost and without a required contract, and where the plaintiff had knowledge of that fact and then proceeded to take no action to enforce the copyright." Dkt. 174 at 5.

With respect to the *thousands* of "public" patches that Sun made freely available without a support contract, this is *exactly* what the evidence shows (*see supra* pp. 5–6, 19–20); at the very least, there are a host of factual disputes related to these issues.

For instance, Oracle admits that Sun affirmatively released *all* security patches and firmware updates freely.  *See* Ex. 110 at 22:20–23:1; Ex. 116 at 34:17–35:18.  Sun promised to *continue* keeping them freely available prospectively.  Indeed, Sun's Director for Software Patch Services published on Sun's public-facing patching blog an "entry to avoid causing unnecessary confusion with the current patch entitlement policy *now that Oracle has acquired Sun*," in which he stated unequivocally that "*[a]ll security fixes will continue to be available to customers without a support contract.  **That is not changing***." Ex. 154 at 670–71 (emphases added).  These overt acts constituted abandonment.

Oracle made a conscious decision *not* to enforce any remaining rights over patches released by Sun because ███████████████ and Oracle wanted to appease long-standing Sun customers.  Ex. 110 at 115:12–121:8; *see also* Ex. 118 at 44:18–45:11 (Oracle opted to ███ ██████████████████████████████████████████████████. Oracle deferred compliance programs for *all* Solaris patches and updates after the Sun acquisition ██████████████ and not until 2013 did Oracle finally decide to initiate ████████████████—but even then only ██████████████████████████████████

1 ███████████████████████████████████████ Ex. 150 (emphasis added).  Oracle executives

2 acknowledged that third-party maintainers could legally provide patches and updates released pre-

3 acquisition because they ████████████████████████████████████████ Ex. 148

4 at 230; *see also* Ex. 159 (Letter from Oracle to Michigan Attorney General).

### 3.      Implied License and Estoppel

6       The parties' course of conduct and oral conversations established an implied license with

7 respect to supporting the "direct support" customers, and estop Oracle from suing on conduct that

8 Oracle authorized.  HPE was an authorized reseller of Oracle's support offerings.  Ex. 30 ¶ 18.  On the

9 direct support customers, Oracle and HPE operated much like a partnership, working *jointly* to ensure

10 customers received necessary support on their Sun servers.  *Id.* ¶¶ 18–19.  The parties had an informal

11 but open understanding that customers should receive the required support, and then the parties could

12 compare records and true up any fees owing for the time of any inadvertent support lapse.  Ex. 117 at

13 296:7–299:2; Ex. 160.  HPE relied on this in providing support and in reselling Oracle contracts, from

14 which Oracle profited handsomely.  It is for the fact-finder to decide whether copying outside a support

15 contract in connection with this relationship was impliedly licensed, or if Oracle is estopped from

16 asserting the copying as infringement.  As the Court noted in denying Oracle's motion to strike, there

17 are a host of factual disputes related to these issues (Dkt. 174 at 4–5), and Oracle's summary judgment

18 motion does not submit any undisputed evidence resolving those disputes.

### 4.      Fair Use

20       Courts assessing "fair use" consider (1) the purpose and character of the use; (2) the nature of

21 the copyrighted work; (3) the amount and substantiality of the portion used; and (4) the effect upon the

22 original work.  17 U.S.C. § 107.  As the Court recognized (again, in rejecting Oracle's identical

23 arguments in its motion to strike), this is a highly fact-bound defense (Ex. 182 at 6:8–22); it generally

24 should not be adjudicated on summary judgment.  *See Wright v. Warner Books, Inc.*, 953 F.2d 731,

25 735 (2d Cir. 1991) ("a district court should be cautious in granting Rule 56 motions in th[e] [fair use]

26 area").  And Oracle's motion, again, submits no undisputed evidence resolving the fact disputes.[9]

27

28 [9]  The Federal Circuit's recent decision in *Oracle America, Inc. v. Google LLC*, 886 F.3d 1179 (Fed. Cir. 2018)—decided after *two* jury trials—does not alter this analysis.

Gibson, Dunn &
Crutcher LLP

A jury should determine whether HPE's alleged conduct—its download, temporary storage, and ultimate delivery of patches **to licensed customer servers** as part of its third-party support service—was transformative.  The purpose of the conduct "was for the provision of technical support services, maintenance, and repair, not for the purpose of reselling protected works or otherwise profiting off of Oracle's copyrighted material."  Dkt. 314 ¶ 45; *see also* Dkt. 174 (defense sufficiently pleaded where "the purpose of [HPE's] alleged infringing use was to provide technical support services, maintenance, and repair").  Even "if the intended use … is for commercial gain," "market harm cannot be presumed" where, as here, the use is transformative.  *Amazon*, 508 F.3d at 1168.  HPE's limited digital storage of patches in servicing licensed customer servers in no way "usurps the market of the original work." *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 482 (2d Cir. 2004).  In fact, it in no way "serve[s] as a market substitute or even harm[s] the market value of the works" at all.  *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 643 (4th Cir. 2009); *see also Amazon*, 508 F.3d at 1168; *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 85–86 (2d Cir. 2014) ("exact" copying was fair use because it "did no harm to the legitimate copyright interests of the original author").

### 5.    Section 117

It is not infringement to make copies as "an essential step in the utilization of the computer program in conjunction with a machine."  17 U.S.C. § 117(a)(1).  Hardware break-fix support can include firmware restoration.  Ex. 128 at 29:6–17, 30:4–11.  Oracle alleges infringement of its firmware registrations and therefore HPE is entitled to assert this defense.  SAC ¶ 64.  Moreover, "essential steps" include patches that "correct[] programming errors" (*cf. Krause v. Titleserv Inc.*, 402 F.3d 119, 125 (2d Cir. 2005)), like those at issue here.  Section 117 also exempts copies made "for archival purposes only" (17 U.S.C. § 117(a)(2)), and customers here archived patches for later use (*supra* pp. 19–20).  The defense therefore applies squarely to a portion of Oracle's claims.  The only evidence Oracle cites is a denied request for admission.  *See* Oracle Mot. at 25.  Oracle's argument is no different from the one the Court rejected at the motion to strike stage, and it should be rejected again.

### V.    CONCLUSION

Oracle's motion should be denied.

1    Dated: April 27, 2018                    GIBSON, DUNN & CRUTCHER LLP

2                                             By: /s/        *Jeffrey T. Thomas*

3                                             Attorneys for Defendant
                                              HEWLETT PACKARD ENTERPRISE COMPANY
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28